ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* STAMPS.

Opinion delivered July 15, 1907.

1. JUROR—DISQUALIFICATION—OPINION.—A juror is not disqualified because he entertains an opinion regarding the case, based on rumor, which it would take evidence to remove if, notwithstanding such opinion, he is able to try the case fairly on the evidence. (Page 245.)

2. CONTRIBUTORY NEGLIGENCE—ACTION IN EMERGENCY.—Where there were two courses left open to a person in the face of imminent danger, and on the spur of the moment he chose the more dangerous, he cannot be held as a matter of law to be negligent in his choice, although by choosing the other course he might have escaped. (Page 245.)

3. DAMAGES FOR DEATH—CONSCIOUS INTERVAL—EXCESSIVENESS.—Deceased was struck on his hip by a train at a bridge, was thrown upon an iron girder parallel with the bridge with force enough to cause him to fall into the rive, wherein he was immediately drowned; it was not known whether he made outcry, but he was seen to move his hands while falling; when his body was found, there were indications of bruises on the head. *Held,* that it cannot be said that there was not a substantial interval of conscious mental and physical suffering from the time deceased was struck until he was drowned, and a verdict of $500 as compensation for such suffering was not excessive. (Page 247.)

4. EXEMPLARY DAMAGES—CONSCIOUS INDIFFERENCE TO CONSEQUENCES.—The evidence tended to show that deceased, a railway bridge tender, was killed by the defendant's employees while in the discharge of his duty; that they were keeping a lookout and saw his signal to stop the train when they were three hundred or more feet distant, and made no effort to stop in time to avoid injuring him. *Held,* suffi-

cient to support a finding that they were guilty of that conscious indifference to consequences from which malice may be inferred, and which will sustain a verdict for exemplary damages. (Page 248.)

5. INSTRUCTION—GENERAL OBJECTION.—The error of instructing the jury that if certain requisite elements of negligence are found "you will find punitive or exemplary damages," instead of telling . them "you may find," etc., should have been pointed out by a specific objection. (Page 256.)

Appeal from Woodruff Circuit Court; *Hance N. Hutton,* Judge; affirmed.

. *T. M. Mehaffy* and *J. E. Williams,* for appellant.

1. The court erred in its instructions as to exemplary damages, nor was this error corrected when his attention was called to it. 70 Ark. 136; 50 *Id.* 10.

2. Deceased was guilty of contributory negligence,- and can not recover. 70 Fed. 24, 28, etc.; Labatt, Master & Servant, § § 365, 365a.

3. There should not have been any recovery for more than nominal damages. The suit was only for the benefit of the estate, for pain and suffering, and as the death was instantaneous compensation for pain and suffering can not be sustained, 68 Ark. 1-8; 145 U. S. 335.

4. The case calling for only nominal damages, there could be no exemplary damages. 12 Am. & Eng. Enc. Law (2 Ed.), 21; 37 N. W. 118; 70 Ark. 226, 228; 1 Sutherland on Dam. (2 Ed.), § 406; 2 Am. & Eng. Enc. p. 29. The court erred in permitting the question of exemplary damages to go to the jury. 1 Sutherland on Dam. § 403 and notes; 53 Ark. 10.

5. An administrator of an estate in an action of tort can not recover exemplary damages. Kirby's Digest, § 6285; 41 Ark. 296; 11 Ired. (33 N. C.), 247.

6. The challenge to the jurors should have been sustained. 69 Ark. 322.

*P. R. Andrews* and *H. M. Woods,* for . appellee.

. 1. The jurors were competent. 66 Ark. 53; 95 S. W. 159; 69 Ark. 322.

2. No contributory negligence is shown.

3. There is sufficient evidence to sustain the recovery for conscious pain and suffering. 59 Ark. 215.

4. The court properly permitted the question of exemplary

damages to go to the jury, and the verdict is sustained by the evidence.  70 Ark. 226; 2 Sutherland on Damages, p. 1131 and cases cited.

5.  The action was properly brought by the administrator. Kirby's Digest, § 6285; 59 Ark. 222.

6.  Exemplary damages may be recovered in a case calling for nominal damages only.  70 Ark. 226; 2 Sutherland, Dam. p. 1131; 1 Sedgwick on Dam. § 361; 73 Fed. 196.

7.  There was no error in the court's charge.  67 Ark. 209.

HILL, C. J.  This was an action by R. D. Stamps, as administrator of the estate of S. W. Kirby, to recover damages, compensatory and exemplary, for his death, against appellee railroad company.  The trial resulted in verdict and judgment for $500 compensatory damages for the benefit of the estate, and $2,500 exemplary damages, and the railroad company has appealed.

S. W. Kirby was assistant watchman on the appellant's bridge over White River, near Augusta.  The bridge is a drawbridge, and it was the duty of the watchman and assistant watchman to open the draw for boats when they received signals from them.  Boats were given precedence over trains unless the train was too close to be stopped.  It was the custom and duty of the watchman, when he received a boat signal, and no train then being on hand, to put out red signal flags at either end of the bridge, one hundred to one hundred and fifty feet away, before opening the draw.  These flags called for the train to stop. It was the duty and custom of the watchman to go to the end of the draw when the train approached and there personally signal a stop.  There was a signal post about a thousand feet west of the bridge at which the engineers were to give notice of their approach and slow down the speed of their trains and get them under control.  There was another post called the stop post, about 150 feet west of the bridge, and trains were to stop at that post unless they received the proper signal to proceed across the bridge.

The draw span of the bridge is 270 feet long—135 feet from the middle pier to either end—and the bridge proper extends 35 or 40 feet west of the end of the draw span, and then commences the approach to the bridge, which, on the west side, is over a thousand feet in length.

On the 26th of December, 1905, Mr. Kirby was in charge of the bridge, and about the middle of the afternoon he received a signal from a boat to open the drawbridge, and he proceeded to do so, but did not place any flags at either end of the bridge. He unlocked the west end, and this caused the rails on the draw to be raised above the rails with which they were connected when the draw was closed. The east end had not been unlocked.

A freight train whistled from the west when at a distance variously estimated from 1,200 to 2,000 feet from the bridge. Kirby responded to this signal, but when and where was the controversy. That he was caught by the engine between the west end and the center of the bridge, as he was running back from the west end, cast into the river and drowned are facts established. It was some two months before his body was recovered.

There were four eye witnesses besides the engineer and fireman; three of these were introduced by the appellee, and one by appellant. They all say that Kirby was unlocking the draw when the train whistled, and that he at once went to the west end of the draw with his signal flag; was there waving to the train when it came in sight around the curve, a distance of not less than 800 feet, and usually estimated at one thousand or more.

The engineer and fireman say that Kirby was not at the west end of the bridge when the train came in sight; that the first time he appeared was when the train was near the stop sign, some 200 or 300 feet away, when he began signalling from near the center of the bridge. Then the engineer attempted to stop; put on the emergency brake and sanded the track (the steam had already been cut off); and that was all that could have been done to bring the train to a stop. The engineer says that, owing to the curve and grade at that point, it was very inconvenient to stop long trains just before reaching the bridge, and that the custom had grown up among engineers of getting their trains under control when about 1,200 feet away and watching for the signals on the track as to the bridge being clear, and, if it was clear, to proceed without pause so as to make the curve and grade. If the signal flags were out, they could see them in time to come to the necessary stop. That in this instance he had his engine under control at that point, and looked

out where the flag should have been, and, not seeing it, assumed that the bridge was clear, and released his brakes and went ahead. That, when Kirby did appear upon the bridge, he could not regain control of the train at once because, having just released the brake, the air was out of it, and prevented his getting the train under immediate control; he ran on the bridge and, striking the upraised track on the draw, the locomotive and one or two cars were derailed. The bridge was considerably torn up by the derailment. The train stopped a little short of the middle of the bridge.

The decided weight of the testimony is that the absence of the flags at the distance of 100 or 150 feet from the bridge had nothing to do with the action of the train, for the witnesses say that Kirby was in plain sight, waving his flag before the train came in view. It was indisputably established that a man standing at the west end of the draw where they say Kirby stood could be seen further down the track than a stationary signal flag posted at the usual place. This was admitted by the engineer himself. The irreconcilable conflict in the evidence is as to Kirby being at this point when the train came in sight. Other facts will be stated as the different issues are discussed.

1. A question preliminary to the merits of the cause of action is presented as to the qualification of certain jurors. These jurors stated that they had formed opinions regarding the case, and that it would require evidence to remove those opinions; but they stated that their opinions were based upon common reports and rumors, and not from personal knowledge, nor derived from witnesses, and these opinions would not preclude them from considering the case fairly. This statement from *Sullins* v. *State*, 79 Ark. 127, is applicable here: "We attach little importance to their (jurors') statements that it would take evidence to remove the opinions held by them; for, if one man has an opinion of any kind, it is natural that it should take evidence of some kind to remove it. That would be true of an opinion formed from rumor merely, but our statute expressly provides that such an opinion shall be no ground for challenge."

2. It is insisted that Kirby was guilty of contributory negligence in two particulars. First, in failing to put out a danger flag before attempting to open the draw.

The court in the tenth instruction, given at the instance of the appellant, which is set out in the footnote,* submitted this question to the jury; and the finding of the jury that his failure in this respect did not contribute to the accident can not be disturbed, and is responsive to the preponderance of the evidence.

The second ground of the alleged contributory negligence is that he could have stepped out of the way of the train and got upon a floor beam. These floor beams are about 20 feet apart, and cross the girders which run parallel with the track, and they are for the purpose of riveting the bridge together. They are 12 or 14 inches wide, and from the rail to the upright post of the superstructure the distance is five feet and a half. An engine or car extends about two feet and a half over the rail, thus leaving a space of about three feet by 12 or 14 inches for a person to stand on and be clear of a passing train. Some of the witnesses thought Kirby might have escaped danger by getting out on one of these floor beams, while others regarded it as a risky venture. There was a platform about fifty or sixty feet back from the west end of the draw. This was about 18 feet lengthwise with the track, and sixteen feet wide. It was called a "jigger." And there was a little house in the center of the draw span, over the middle pier. Kirby was evidently trying to reach one of these places as he ran from the approaching train.

Where there are two courses left open to a person in the face of imminent danger, and he chooses on the spur of the moment the one which is really the more dangerous, he can not be held as a matter of law to be negligent in his choice, although by choosing the other course he might have escaped. In this instance, had he chosen to have stepped out on a floor beam and been knocked into the river by a flying timber, the argument might as well have been made that he should have tried to reach the platform.

---

*"10. If Kirby, at the time the steamboat gave the alarm for the opening of the draw section of the bridge in question, knew, or by the exercise of reasonable diligence could have discovered, that it was his duty, before unlocking the drawbridge, to set out a flag at or beyond the end of such drawbridge, as a warning to trains, and failed to set out such flag, and his failure in any manner contributed to the accident in question, then the plaintiff can not recover, regardless of whether or not the train crew, or any of them, were negligent."

The court submitted, at the instance of appellant, the question of contributory negligence in this respect to the jury in the 12th instruction, which will be found in the footnote.†

There is nothing in the record to justify the court in disturbing the acquittance of the deceased of contributory negligence in either respect.

3. The next point raised is that there was instant death, and hence compensation for pain and suffering prior to death can not be sustained. The facts testified to by eye witnesses were that the steam cylinder of the locomotive struck Mr. Kirby on the hip and knocked him from the bridge, and he fell on an iron grider, parallel with the bridge; that he struck this grider with some force, enough to make him bounce. Then he dropped his flag, which fell on one side of the grider and he on the other; and that as he fell from it he drew up his hands close to his breast. Another witness saw his left arm raised as he was falling. The bridge was 20 or 25 feet above the water. The river was swift and deep at this point. He was not seen after his fall. The train was making so much noise that it is not known whether he made any outcry or not. When the body was found some two months later, there were indications of bruises on the head.

For a recovery to be had for pain and suffering, there must be some appreciable interval of conscious suffering after the injury and before death. *St. Louis, I. M. & S. R. Co.* v. *Dawson,* 68 Ark. 1.

In *Texarkana Gas Co.* v. *Orr,* 59 Ark. 215, it was said "that the struggles of deceased were of the briefest character. He cried out twice, and his hands were burnt and drawn by the wires. He died almost instantly." Yet in that case a recovery for conscious pain and suffering was sustained.

There is a conflict in the authorities as to whether in case of death by drowning there can be a recovery for conscious pain

---

†"12. If Kirby, after discovering any danger to himself by reason of the approaching train, discovered, or, as a reasonably prudent person under the circumstances, ought to have discovered, that he was in danger, and if he could have thereafter avoided such danger to himself by stepping upon one of the floor beams or any other part of the bridge, where he could have avoided the injury, and failed to do so, then the plaintiff can not recover."

and suffering. See *St. Louis, I. M. & S. Ry. Co.* v. *Dawson,* *supra.*

It can not be said, in view of the evidence above detailed, that there was not a substantial interval of conscious mental and physical suffering from the time Mr. Kirby was struck on the hip by the locomotive on the bridge until he met his death in the river below; nor can it be said that the jury's verdict of $500 is an excessive compensation for such suffering.

4. The remaining question is as to exemplary damages. The testimony of the engineer and the fireman can not be reconciled with that of the other eye witnesses. It is impossible to take it as explanatory of facts established by other witnesses, for it is in direct conflict upon a vital point. The witnesses who saw the engineer and fireman say that they were looking ahead. They also testify that they were keeping a sharp lookout. And yet they say that they did not see Kirby on the west end of the bridge signalling to them as soon as the train rounded the curve, and they say that he was not there then nor later, and that he did not appear until they were within two or three hundred feet, when he commenced signalling them from near the center of the bridge. Whereas, as stated, the other eye-witnesses say that it was before the train came in sight that Kirby went out upon the west end of the draw, and was there signalling the train, when it was distant about a thousand feet. Either their testimony must be accepted and that of the engineer and fireman discarded, or the latter accepted and the former discarded. The jury is the tribunal which settles such matters, and it has discarded the testimony of the engineer and fireman, and this court must take as the truth of the case the testimony of these other eye witnesses.

It was proved that the train approached the bridge without slackening speed (some say it was running 20 miles an hour when it struck the bridge), which was contrary to the rules of the company (and, it must be added, contrary to common sense and common prudence as well) ; but it was sought to be justified by custom. Be that as it may, nothing can justify the running of a train upon a drawbridge in this manner when a man was standing upon it waving a danger signal. Kirby was thirty-five or forty feet back from the west end of the bridge at the begin-

ning of the draw span, and was sixty feet west from the platform called the "jigger," and 135 feet from the house in the center of the bridge. The only other places where he could seek safety, and that a precarious safety, were the floor beams which occurred about every 20 feet. It was Kirby's duty to be where he was at the end of the draw; and, if the operatives of the train had obeyed the rules, he was safe in being there; if they had obeyed the signals given by him, and there is no circumstance or custom to excuse their failure to do so, he was safe. But, instead of doing either, they ran upon him without signal or warning. There was no signal given that they intended to disregard his stop sign, and he had a right to assume that they were going to obey it. Unfortunately for him, he relied upon their obeying his signal until it was too late for him to save his life. They have now sought to justify their conduct by saying that Kirby was not there. But, as indicated, the court can not, in the light of the finding of the jury upon substantial evidence, accept that as the truth of the case, but must regard it otherwise. Taking it as established that they were looking at him while travelling the distance of a thousand feet, and that they did nothing to warn him of their intention to run on the bridge, and made no effort to stop the train until too late to save his life, can it be said that the verdict for exemplary damages was not sustained by sufficient evidence?

In *Railway* v. *Hall*, 53 Ark. 7, Mr. Justice SANDELS, speaking for the court in his terse style, distinguished the elements of exemplary and compensatory damages, and said of the former that it must contain "the element of willfulness or conscious indifference to consequences, from which malice may be inferred;" and that "a careless unconsciousness of plaintiff's possible danger" was not sufficient to constitute a basis for exemplary damages. Applying this principle here, it can not be said that the jury was not warranted from the facts in evidence in finding the train operatives guilty of "conscious indifference to consequences, from which malice may be inferred."

Criticism is made of the instructions in regard to exemplary damages.

At one place in the oral charge of the judge to the jury, which covered the issues generally, this occurred:    " 'On the

other hand, if you find there was negligence on the part of the road or its employees, and no negligence on the part of the plaintiff, you will find punitive or exemplary damages; that, as to amount, is governed by the same rule—that is, your sound judgment and discretion.'

"Here objection was interposed to this instruction by attorney for the defendant, whereupon attorney for plaintiff arose and asked the court to instruct the jury that the negligence on the part of the defendant, in order to support punitive damages must be wanton, willful and gross. Thereupon the court said: "Yes, that is true," and, turning to the jury, said: "Yes, gentlemen of the jury, before you can find punitive damages in any amount, you must first find that the negligence of the defendant, if any, was gross, wanton and willful; that is, the kind of negligence of the employees of the railroad company inflicting the injury in violation of its rules."

As above seen, the trial judge, evidently through oversight, left out the necessary elements of exemplary damages, but promptly corrected the error when his attention was called to the oversight. Although the latter part of his explanation lacks clearness, if it be taken in connection with his whole charge, the jury could not have been misled, for the instructions as to exemplary damages were full and explicit.

Judgment is affirmed.

RIDDICK, J., (dissenting.) I am not able to concur in that part of the opinion which upholds the judgment for exemplary damages. The main facts in the case, as they appear to me, are as follows: S. W. Kirby, for whose injury and death damages are sought in this case, was an assistant watchman employed by the railway company and on the day he was killed was in charge of its bridge across White River near Augusta, Arkansas. It was his duty, when signalled by boats desiring to pass the bridge, to open the draw for them to pass through. The regulations under which he acted required that before unlocking the draw he should place red flags about 100 feet from each end of the bridge to notify those in charge of trains approaching the bridge that the draw was open or about to be opened. On the day of the accident, a boat blew a signal to open the draw, and Kirby commenced to open it without first putting out the flags in front of

each end of the bridge, as the regulations required. He un-locked the west end of the draw, and then went to the east end of the draw and began to unlock that when a freight train sig-naled its approach from the west. From the west end of the bridge the track curved south, and trains coming from that direction could not see signals from the center of the bridge plainly until they arrived within about two hundred yards of the end of the bridge. After giving the signal it was the duty of the employees in charge of the train to get the train under control and to bring it to a stop at a post called the stop post, which was about fifty yards from the end of the bridge, unless they re-ceived a signal from the bridge watchman to go over the bridge. There was a rise in the track as it approached the bridge from the west. This grade made it inconvenient to stop heavy trains at that place, and a custom had grown up among engineers of freight trains not to bring such trains to a full stop before be-ing signalled but to slow up, and if no danger signals were seen to go over the bridge without stopping. When the train that caused the injury approached, the engineer in charge gave the signal of its approach and slackened its speed to some extent, but the engineer, not seeing the danger signals, did not bring the train to a full stop before reaching the bridge. When Kirby, the watchman, heard the train signal, knowing that no flags were out to indicate danger, and that the engineer, unless flagged, might attempt to pass the bridge, he ran from the east end of the draw span where he was at work to the west end thereof to signal the approaching train. It is not shown whether this bridge was floored so that one could run at full speed on it or not, but, remembering that when the train gave the signal of its approach it was not much if any over four hundred yards away from the bridge, that Kirby, being at the east end of the draw span of the bridge, had to go 270 feet or 90 yards to reach the west end of the span and had to stop on the way to get a flag from a small house in the center of the bridge with which to signal the train—remembering these things, it seems certain that, if the train as claimed by plaintiff was approaching at the rate of 20 miles an hour, it must have gone four or five times the distance that Kirby traveled. When he reached the west end of the draw, the train must have been several hundred yards

nearer the bridge than it was at the time the signal of its approach was given, and it could not have been very far from the bridge. For this or some other reason the engineer did not discover the condition of the bridge until it was too late to stop the train before reaching the bridge. Just at the west end of the bridge there was a small platform built on the side of the track called a "jigger." This platform was about fifty feet west of the draw span of the bridge. If Kirby had reached this place, he would have been safe. But he went no further west than the end of the draw span. After flagging the train from that point and seeing that it was not going to stop, he ran back towards the center of the draw span, probably to seek safety in the small house built on the bridge there. Before the train reached the west end of the bridge, the engineer and fireman had observed the signals given by Kirby, and saw also that the west end of the draw span was unlocked, and were no doubt doing all they could to stop the engine and train. Knowing that there was great danger in remaining on the engine under such circumstances, the fireman jumped from the engine to the "jigger" platform at the end of the bridge. But, despite the danger to which he was exposed, the engineer remained on his engine. Notwithstanding his efforts to stop it, the engine went on the bridge and mounted the draw span of the bridge, but some of the cars were derailed by the fact that the span had been unlocked and was higher than the connecting span. The engine ran to within thirty or forty feet of the center of this span, and before it was stopped struck Kirby and knocked him into the river, causing his death.

The evidence, I think, justified a finding against the company for actual damages, but "the element of wilfulness or conscious indifference to consequences from which malice may be inferred" is lacking, and for that reason the case is not one for exemplary damages. *Railway* v. *Hall*, 53 Ark. 7.

A mere error of judgment as to the result of doing an act or the omission to do an act, having no evil purpose or intent or consciousness of probable injury, may constitute negligence, but can not rise to a degree of wanton negligence or willful wrong. *Birmingham Ry. & El. Co.* v. *Bowers*, 110 Ala. 329.

The Supreme Court of the United States, in a case where the

plaintiff sought to recover exemplary damages on the ground that the defendant was guilty of gross negligence, referred to a remark of Baron Rolfe, afterwards Lord Cranworth, to the effect that "gross negligence is ordinary negligence with a vituperative epithet," and said: "Gross negligence is a relative term. It is doubtless to be understood as meaning a greater want of care than is implied by the term 'ordinary negligence;' but, after all, it means the absence of care that was necessary under the circumstances. In this sense the collision in controversy was the result of gross negligence, because the employees of the company did not use the care that was required to avoid the accident. But the absence of this care, whether called gross or ordinary negligence, did not authorize the jury to visit the company with damages beyond the limit of compensation for the injury actually inflicted." *Milwaukee & St. P. Ry. Co.* v. *Arms,* 91 U. S. 489.

There are many other well-considered cases that support the rule that the mere fact that a defendant had been guilty of negligence, whether gross or not, does not justify the imposition of exemplary damages unless the circumstances were such as to raise the inference of malice or to show that the injury was wilfully inflicted. *Ry.* v. *Hall,* 53 Ark. 7; *Scott* v. *Donald,* 165 U. S. 58; *Magrane* v. *Railway,* 183 Mo. 119; *Alabama G. S. Ry. Co.* v. *Moorer,* 116 Ala. 642, 9 Am. & Eng. Enc. R. Cases, N. S. 742.

The case of *Railway* v. *Hall,* above cited, and which is also quoted in the majority opinion, declares that there must be an element of wilfulness or that the circumstances must be such as that malice may be inferred. But what is there in this case to show wilfulness or from which malice can be inferred? The idea that the engineer of this train approaching a bridge across a deep navigable river, with the central span of this bridge fixed so that it could turn on hinges and admit the passage of boats, intentionally disregarded the signal of the watchman to stop, that he did this knowing that the signal meant that the draw span was unlocked and unsafe for the train; that, knowing these things, he ran his train on the bridge wilfully or with conscious indifference to the danger incurred, is about as unreasonable a supposition as could well be imagined. The evi-

dence of all the witnesses shows that when Kirby came out of the small house on the bridge where he went to get a flag he began waving the flag as he went towards the west end of the draw span. He must have been waving this flag when first seen by the engineer and fireman, and until they saw him they had no reason to believe that running the train on the bridge would result in injury either to him or themselves. Up to that time there could not have been any wilfulness or anything indicating malice. They both testify that, so soon as he was seen, the engineer applied the emergency brake and tried to stop the train. It ought to require strong evidence to show to the contrary, for when the engineer saw that signal he knew that it meant that the draw span was unlocked, and that, unless the train was stopped, a wreck was certain, and that the whole train might be thrown in the river. It is quite unreasonable to believe that with this knowledge he made no effort to stop the train, unless he was paralyzed by the appalling danger that confronted him. But there is really no evidence to contradict his statement that he at once on observing the signal tried to stop the train. It is true certain witnesses testified that the train did not slacken its speed for sometime after it was flagged by Kirby. The engineer explained that the reason why he could not check the train more quickly was that he had applied the air brakes before he got in sight of the bridge, but, not seeing any danger signal, he had released the brakes just before he saw Kirby. That, on seeing Kirby waving the red flag, he at once applied the emergency brakes and sanded the track, but that, the air having been used, the brakes would not at once give the full amount of pressure. This is a reasonable explanation, which is not contradicted; but, if we disregard that entirely, the fact that the speed of the train was not checked may show that the engineer and fireman were not keeping a lookout, it may show that the engineer did not exercise due skill in handling the train, but that is a very different matter from showing that he intentionally ran his train on the bridge after seeing the signal and knowing that the draw span was unlocked, and that the danger to the train and himself was imminent. The moment that he saw Kirby waiving the red flag, he must have recognized the great peril to himself as well as to Kirby if the train was not stopped.

To find that the engineer wilfully put the life of Kirby in danger is to find that he wilfully exposed himself to great and imminent peril for no reason whatever, but the evidence shows nothing of the kind.    Negligence, I admit, is shown, but to my mind the circumstances all rebut the idea that the injury was wilfully inflicted, or that there was anything wanton or wilful in the conduct of the engineer.    For that reason I am convinced that exemplary damages ought not to be allowed.

Wood, J., concurs in dissenting opinion.

ON REHEARING.

Opinion delivered November 4, 1907.

HILL, C. J.    1.    Counsel have forcibly re-argued this case and presented, strongly fortified by argument, the dissenting opinion of the late Mr. Justice RIDDICK.    That is one of the strong opinions of a strong man.    The point of difference between it and the opinion of the majority of the court is in the view taken of the evidence, and not in the law.    The writer of that opinion and the judge who agreed with him in it were convinced that Kirby was not standing in plain view, waving his flag at the end of the draw, when the train came in sight.    If the majority could see the facts that way, there would be no escaping the conclusion stated in the opinion of Mr. Justice RIDDICK.

There was a conflict in the testimony.    Which was the truth cannot be known here.    The jury has accepted that version which placed Kirby at the end of the draw, waving his flag in plain view when the train came in sight, some thousand feet distant.    If that be taken as an established fact, and the verdict settled it, then, as the majority see it, there can be no escaping the sequence, which was that there was a "conscious indifference to consequences from which malice may be inferred."    It is no answer to say that this version must not be accepted because the engineer would not recklessly run into an open bridge to his own certain destruction, for it was not visibly opened.    The partially raised rails, only a few inches above the others, could not possibly have been seen by the engineer until he was on the bridge, if then.    So far as appearances went, he was merely refusing to

obey a stop signal, and to his eye the bridge was ready for his train.

Counsel for appellant have presented inconsistencies and contradictions in the testimony of the four witnesses who place Kirby at that point. Each of them saw the accident from a different place. Each has told the story as differently viewed; and it is to be expected that there would be inconsistencies and contradictions in such testimony. But as to the essential fact—that before the train came in sight Kirby was standing on the west end of the draw waving his flag—there is nothing to contradict the testimony of any one of them, and nothing that the court can see which weakens the force of their respective statements as to this fact.

2. Counsel insist that there should be a reversal for the error in the oral instruction, and say that the erroneous instruction cannot be cured by a correct one. But the erroneous instruction was so quickly withdrawn, and the correct instruction substituted immediately upon attention being called to the error, that the court is unable to see that any prejudice could possibly have resulted.

Another error is called to the attention of the court in this oral charge of the judge, and that is, that he told the jury if the requisite elements were present "you will find punitive or exemplary damages," instead of saying that they were *authorized* to find, etc. It is true that exemplary damages are not required to be given in any case; merely that certain facts may authorize a jury to award them in their discretion. 2 Thompson on Trials, § 625; 1 Sedgwick on Damages, § 387.

This error occurred in the paragraph of the oral charge that has heretofore been noticed as erroneous. Objection being made to this paragraph by the defendant's attorney, the plaintiff's attorney at once saw that the court had erroneously left out the elements of grossness, wantonness and wilfullness required, and called the court's attention to it; and the court at once accepted the correction, and turned to the jury and said: "Yes, gentlemen of the jury, before you can find punitive damages in any amount, you must find first that the negligence of the defendant, if any, was gross, wanton and wilful."

This was a correct instruction, and was given in place of the paragraph which had just been objected to, which contained the objectionable phrase now complained of, as well as the objectionable phrase heretofore complained of.   Evidently, the objection was taken to the absence of the gross, wanton and wilful factors, and that was what the court inserted; and his attention was not called to the fact that he had said, "will find," instead of "may find."   The objection to this part of the charge by defendant's attorney was as follows:   "Defendant at the time objected and excepted to that part of the court's oral charge to the jury upon the question of punitive or exemplary damages, to the effect that if there was negligence upon the part of defendant and no negligence upon the part of the deceased, the jury might find punitive or exemplary damages."

Thus it is seen that the defendant's attorney at the time construed this as a mere authorization to find exemplary damages, and not as direction to do so.   It must be borne in mind that this was a general statement unnecessarily explanatory of the instructions which had been given, one of which correctly stated that such damages might be added if the jury thought proper under the circumstances.

The court has given unusual attention to this case, both upon its first consideration and now upon this consideration, because it has recognized that it presented a difficult question of fact, and one upon which the minds of the judges of the court have drawn different conclusions.   But the majority is of the opinion that the conclusion heretofore reached was the correct one, and the motion for rehearing is denied.