PINSON *v.* STATE.

4406

194 S. W. 2d 190

Opinion delivered April 29, 1946.

Rehearing denied May 27, 1946.

*Eugene Sloan, Norris Webb* and *Bruce Ivy,* for appellant.

*Guy E. Williams,* Attorney General, and *Earl N. Williams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. The information charges Pinson with having killed Charles Shelton and that the act was such as to constitute murder in the first degree. Appeal is from judgment on a verdict finding the defendant guilty and fixing his punishment at imprisonment for life.

Shelton was shot October 18, 1945, and died the following day. Chapman-Dewey Lumber Company owns Hatchiecoon Island and rents lands to various tenants. A large part of the area is timbered, and about 150 acres have been cleared. Pinson occupied one of the tenant houses and cultivated 46 acres. Shelton share-cropped a small tract and lived with his wife and two children[1] in a house "back in the woods." Pinson had operated a sawmill on Hatchiecoon and had employed Shelton as a laborer, but at the time Shelton was shot he was not employed by or making a crop for Pinson.

On the morning of the tragedy Shelton left his home for the purpose, as his wife explained, of "baiting" some wild hog traps. He carried a .22 rifle with a broken mainspring. The hammer or firing pin was operated with a rubber band.

Wes Mooneyham, deputy sheriff, testified that Pinson "flagged him down" in Lake City about 11:15 o'clock October 18 and said that he had just shot a man. With

---

[1] The oldest child was three years of age, the youngest nine months. Shelton was 37 years of age and weighed approximately 140 pounds.

another deputy and Dr. Edgar Ellington, Mooneyham left for the island. Shelton was found sitting on a porch near a point called Deep Landing, not far from the St. Francis river levee. Mrs. Pinson, with a neighbor named Tuttle, (apparently Henry Tuttle) had assisted the wounded man to a boat and they had rowed across a narrow strip of water. Shelton complained of being cold and asked to be allowed to sit in the sun. At that time he was able to walk, and to talk with extreme difficulty, but seemingly the loss of blood had made him sensitive to the October weather.

Assignments of errors are (a) that statements made by Shelton while crossing in the boat, while waiting for the doctor, and after the doctor arrived, (such statements having been testified to by Mrs. Shelton) were inadmissible as dying declarations; (b) that photographs and plats introduced by the State were not properly identified; (c) that there should have been an instructed verdict for the defendant, and (d) that the Court erred in refusing to grant a new trial because of newly-discovered evidence.

One of our latest cases on dying declarations is *Cross* v. *State*, 200 Ark. 1165, 143 S. W. 2d 530. The wounded man had stated to a cousin that he was "shot all to pieces" and could not live. In *Broughton* v. *State*, 199 Ark. 1187, 133 S. W. 2d 3, the injured man said, "I am dying [am I not?]." In *Clements* v. *State*, 199 Ark. 69, 133 S. W. 2d 844, the declarant told a nurse he was "pretty sick," adding, "I am going to have a hard time if I make it." See "Homicide," West's Digest, v. 10, § 200 *et seq.*

In the case at bar Dr. Ellington was asked regarding the patient's condition when he found him near Deep Landing. The answer was: "The whole side of his face was shot off. It was hanging down here on his shoulder."

Mooneyham testified that a third or a half of Shelton's tongue was shot off, and that he was getting weak: —"I could see he couldn't talk much, and we didn't bother him. . . . Later when he was taken to a hos-

pital [at Jonesboro] they put him to sleep to try to patch him up, but he never did regain consciousness.''

Shelton had bought a cow on credit, having agreed to make payment in corn from his crop when it should be harvested. Mrs. Shelton testified that her husband, while in the skiff or canoe, asked Tuttle to pay for the cow, remarking, ''I won't be coming home.'' Shelton had previously stated that Pinson shot him. Mrs. Shelton was permitted to testify that the wounded man told her there had not been a quarrel, but that ''Pinson just stepped out and shot me.'' Shelton claimed that he did not see Pinson before the shot was fired.

To an impressive degree some of Mrs. Shelton's statements regarding what her husband had said were verified by Mooneyham, and by Dr. Ellington. While Shelton was waiting for transportation to a hospital, Mooneyham, Dr. Ellington, another deputy, and Pinson drove up. Pinson had been arrested when he reported to Mooneyham that he had shot Shelton.

Pinson contended that Shelton was the aggressor, and that he fired in necessary self-defense. Jim Trawick, who worked for Pinson, and in effect lived with him, claimed to have seen the entire transaction. He supported Pinson's version, but neither was believed by the jury.

According to Trawick, he and Pinson discussed whether Trawick should take his team of mules off the island, or wait until later. During this conversation Pinson said something about having found a beetree; and then, addressing Trawick concerning the mules, added: ''While you are thinking it over we will go get a 'mess' of squirrels.''

Trawick says that as they stood or walked near a path in the woods someone approached, and Trawick recognized Shelton. Later Shelton and Pinson began arguing, the effect of Shelton's attitude being that he was going to set wild hog traps ''all over the island.''

Trawick contends that after considerable conversation had taken place between Shelton and Pinson—and during this interval Trawick sought to distract attention

by asserting he thought there was a squirrel nearby—Shelton got behind a tree and told Pinson that one of them had to die. Not until Shelton raised his rifle in a threatening manner, according to Trawick, did Pinson shoot. He used a twelve-gauge shotgun and fired from a distance of twenty-five feet. Shelton fell, apparently dead, and Pinson left immediately with Trawick.

The State introduced evidence from which a fair inference might be drawn that it was nearly an hour before Pinson left for Lake City. The State's theory is that Trawick and Pinson acted in concert, and that each thought Shelton had been instantly killed. When they later found he had sufficiently overcome the shock to walk for help, the idea then occurred to Pinson that an account of the transaction differing from what he and Trawick might tell would be forthcoming. At least this is the State's construction of the circumstances.

The principal consideration upon which so-called dying declarations are admitted is that one who realizes death is inevitable in consequence of the injury inflicted speaks with solemnity and will not resort to fabrication in order to unjustly punish another. But in all cases there must be an abandonment of hope and a definite expectation that life is a matter of but short duration. We think these conditions concurred in respect of Shelton's outlook. The shock must have been terrific, and he had bled profusely. Physical evidence showed where he had lain on the ground near the tree. His hat was found not far from there, and the sack in which he carried corn to bait hog traps was also recovered. It was not speculation in a legal sense when the jury inferred that Shelton, in asking Tuttle to pay for the cow, was thinking of the nine-months-old infant and the three-year-old child, and was worrying about their status when he asked Tuttle to see that the cow was paid for; neither did members of the jury have to go beyond their own practical experiences to conclude that comments and remarks, by Dr. Ellington, who told Mooneyham and Mrs. Shelton he could do nothing for the wounded man, were overheard by the unfortunate husband and father who was within easy speaking distance.

While the newspaper reporter who took the photographs was not called as a witness, the exhibits were definitely identified as those to which witnesses referred. Some who testified even identified themselves in the photographs. There was no contention that the views were a reproduction of the actual shooting, or that the exposures were made from a particular angle. No prejudice resulted from the use made, or from introduction of the rough sketch or plat for the purpose of illustrating a point. Exactness was not claimed, nor was there any contention that distances indicated were sufficiently at variance with actuality to create prejudice.

In the motion for a new trial it is asserted that ". . . the gist of said newly-discovered evidence is to the effect that at various times, including the evening before the shooting took place, . . . the deceased had made, both direct and indirect, threats on the life of this defendant, and in so many words had stated to these newly-discovered witnesses that he intended to kill this defendant."

There was direct evidence of threats made by Shelton—(repeated three times within a few minutes, according to Trawick)—that an intent to kill became an overpowering passion with Shelton when he began talking to Pinson. Tuttle had formerly testified (apparently at a preliminary hearing) regarding his knowledge of Pinson-Shelton relations, but failed to say anything concerning threats. One of the affidavits presented by appellant is signed by Tuttle. His explanation of former silence is that he was not asked. Another proposed witness whose affidavit was filed says that soon after the killing he went to California, and had only recently returned.

Granting or refusing a new trial because of newly-discovered evidence is a matter within the Court's discretion. If that discretion is abused an appellate court will reverse and remand; but where, as here, the defendant and his principal witness admit that they have served terms in penitentiary, and had engaged in questionable conduct as a matter of habit, the Court had a right to

consider such anti-social deportment in determining what credit should be given the testimony tendered.

Trawick, insofar as memory was of service, thought his initial brush with the law occurred in Alabama in 1926 "when they got me on top of an 800-gallon cooker." For this, on a plea of guilty, he was sentenced to a year and a day in the penitentiary. On cross-examination, when seemingly confronted with documents showing that the transaction occurred in 1929, reply to a question was, "I thought it was in 1926; I don't know." Neither did Trawick know the names of two men he shot in Arkansas in 1938, (Richard Hopkins and Willie Fields) but the charge was assault with intent to kill and he served in the Arkansas Penitentiary. On another occasion he was "locked up" on account of public drunkenness. Most of the testimony of this nature was brought out by attorneys for the defendant.

Pinson, too, had not been without his day in court. In 1930 he was convicted on a charge of operating a still and sent to the penitentiary. After serving seven months of a three year sentence a parole relieved the tension. He was in Federal Court, charged with owning and operating a still, possession of [untaxed] liquor, and transporting. All of this trouble, the defendant asserted, grew out of the same primary transaction. Pinson could not recall the number of times he had been arrested for drunkenness.

We think there was substantial testimony for the jury's consideration and that the Court did not err in refusing to give an instructed verdict, or in its rulings upon the admissibility of evidence. There is no showing that discretion was abused.

Affirmed.