BUCHANAN v. STATE.

4520                                        218 S. W. 2d 700

Opinion delivered November 29, 1948.

836

*Adams & Willemin,* for appellant.

*Guy E. Williams,* Attorney General, and *Oscar E. Ellis,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. On a jury's verdict of guilty, appellant was sentenced to serve three years in the penitentiary for keeping a gambling house. Ark. Stats. (1947), § 41-2001. Errors alleged are (a) abuse of discretion in refusing a continuance; (b) acceptance of disqualified jurors; (c) admission of incompetent testimony without limiting its scope; (d) improper exclusion of testimony; (e) insufficiency of the evidence.

Buchanan is a partial paralytic and has been for many years. His lower extremities are without muscular control and a wheelchair is used for locomotion. For a long while resort has been had to enemas as an aid to elimination. Constant use of the syringe has caused hemorrhoids and irritation to such an extent that periodic treatment by a physician was required; hence, when trial was set, the defendant asked for a postponement on the ground that enforced court attendance would produce pain impairing mental acuteness, and want of power to defend would be a denial of due process of law.

(a)—*The Court's Discretion.*—After affidavits had been filed two subscribing physicians were examined in

open Court. Dr. J. H. Stevens said it was a well known fact that when a person is in pain his mind does not "work" with the same accuracy it otherwise would; that, medically speaking, it affects the mental process "somewhat." The witness first examined Buchanan three months before the hearing was had. His condition then was practically the same as it was shortly preceding the questions, although during the interim some of the hemorrhoids had been gotten rid of, and in that respect the patient (upon whom he called every two weeks) was better. About a month prior to the hearing Buchanan began talking about an operation, but the Doctor thought delay was advisable. On cross-examination this question was propounded by the Prosecuting Attorney:

"Dr. Stevens, if [the defendant] has been able to ride in a car from [Jonesboro] to Blytheville, and during the last week or ten days has gone to other places, he was in as good shape then as he was three months ago, wasn't he?" Answer, "Yes, sir, I would say so." Although six weeks previously the doctor had recommended an operation, "the patient is better now than he was three months ago." The condition complained of is chronic, rather than acute.

Dr. John C. Faris first examined Buchanan in 1941. If required to sit upright in a wheelchair for hours attending court the patient would experience "discomfort" —it would become "quite painful, [and] an irritating factor that would contribute to the person's nervousness and irritability." An operation would improve the condition.

The day before this hearing was conducted, Dr. Stevens "called Memphis" in an endeavor to procure hospital accommodations for Buchanan, but had failed. A healing period of ten days or two weeks after the operation would probably be required before the patient would be fit for the limited service of which he was capable.

This question was asked by the Prosecuting Attorney: "Dr. Stevens, the condition you describe is not new —it is an old condition caused by a series of aggravations

over a long period of time?'' Answer, ''Correct! . . . A clinical examination shows no acute change.''

Dr. Stevens was asked whether, until the day before, he had endeavored to procure hospital accommodations for Buchanan, and replied that he had not.

The Court did not abuse its discretion in overruling the motion. While literal construction of what the physicians said in their certificates would justify a belief that the patient's condition had become suddenly aggravated, their oral testimony is not to that effect. The Court was warranted in believing that attendance would not be attended by discomfort to a degree affecting the defendant's ability to effectively participate in the proceedings. Judicial assurance was given that a recess would be called at any time Buchanan required it. That the trial proceeded normally, and without suggestion of the anticipated disability, served to confirm the Court's belief that prejudice would not attend enforcement of the order to try the case.

(b)—*Competency of Jurors.*—Appellant contends that, as a matter of law, T. J. Thornton, Caleb Watson, and Hansel Winters were not competent jurors. Thornton lived at Bono, in Craighead County, and was an employe of the State Department of Revenues, with authority to investigate certain matters of taxation,—particularly evasions—and in some instances to make arrests. He had assisted peace officers in setting up and maintaining road blockades where the purpose was to detain criminals. Primarily the agent's activities were in connection with sales tax collections and related transactions. Pope's Digest, § 13348; Act 299 of 1929.

Thornton, as assistant inspector, had dealt with appellant, but knew nothing of his activities as operator of a gambling house, and was in no sense prejudiced against the defendant.

It is provided by § 8344 of Pope's Digest that a Postmaster, Justice of the Peace, or County officer may be peremptorily challenged when presented for jury service. Ark. Stats. (1947), § 39-230. Appellant concedes that

Thornton did not come within the letter of this enactment, but thinks the spirit of the law is violated when a defendant is compelled to accept as a juror one who is affirmatively charged with official duties of the nature assigned to Thornton. Argument somewhat similar was made in *Smith* v. *State*, 205 Ark. 833, 170 S. W. 2d 1101, where it was objected that a claims referee for Workmen's Compensation Commission was ineligible if challenged. The contention was disposed of with the statement that the statute did not apply. Apropos is the holding in *Corley* v. *State*, 162 Ark. 178, 257 S. W. 750, where it was urged that the Mayor of Tupelo, in Jackson County, could be challenged because he exercised certain criminal jurisdiction as *ex-officio* Justice of the Peace. In the opinion it is said: "The right to challenge a Justice of the Peace peremptorily exists only because the statute confers it, and this right of challenge is limited by the language of the statute which confers it."

The reason for this rule is apparent. One accused by the State is presumed to be innocent until the contrary is shown. In the process of overcoming this presumption certain rights are given by law, varying in different jurisdictions. But in all cases, unless the privilege claimed is a common law right unaltered by constitution or statute, some affirmative authority for peremptory challenge of a juror must be found. The right to serve on a jury is an incident of citizenship, subject, of course, to statutory regulation. But it is a right that cannot be invaded by arbitrary judicial action; nor may the rules be changed merely because in a particular case a factual presumption might conceivably attach, upon which speculation and conjecture could erect a fabric of prejudice.

It is insisted that the *voir dire* examination of Watson and Winters disclosed fixed opinions respecting the accused's guilt. Watson merely knew the defendant, and had never engaged in business or social transactions with him. He had read the newspapers and heard rumors regarding the gambling house, but did not know enough about the transaction to form the basis of an opinion. A fair summary of his status is reflected by the following

excerpt from the examination: "What I have read and what I have heard might have caused me to form some opinion at the time, but I wouldn't deprive a man of his liberty without complete proof of it. . . . I am convinced that, if accepted, I can go into the jury box with an open mind, follow instructions of the Court as to the law, take the evidence as it comes from witnesses, and render a fair and impartial verdict, regardless of who likes it or dislikes it."

On cross-examination Watson said he was a member of the Jonesboro Chamber of Commerce, and the "general situation [relating to gambling] had been discussed by members. To the extent of these discussions, from newspaper articles and pictures, his understanding was that Buchanan "was operating a place on the Paragould Road, . . . but I have no fixed idea of the man's guilt because I don't know any of the circumstances. . . . [On questions of fact] I have an open mind, with no way of knowing whether the rumors I have heard are true or false, and if I have an opinion it is based on hearsay." Question: "Would you, if accepted, be willing to go into the jury box with the presumption that this man is innocent?" Answer: "I certainly would. . . . I am not anxious to get on the jury: I'm merely willing to serve. . . . The notoriety of the defendant would in no sense affect me. . . . I have a very definite feeling that the defendant has not been a good influence in the community; . . . [but irrespective of the views I have expressed] I would regard the defendant as an individual and see that he got a square deal. . . . If, as a member of the jury, the proper procedure is not to mention [the man's reputation], I would avoid doing so. . . . I believe I could reason with fellow jurors only on the testimony heard from the witness stand."

The juror Winters was engaged in the cleaning business at Jonesboro. His only business connection with the defendant involved sale of a pair of trousers a year and a half ago. He had read newspaper accounts of what were alleged to have been the defendant's gambling activities. He knew the defendant had been tried in Fed-

eral Court, thought there was public approval of his conviction, and criticism of the appellate court when the judgment was reversed.[1]  Probably all conversations he had heard were unfavorable to the accused.  Winters readily admitted that he had certain impressions, but they did not rise to the dignity of opinions.  He "presumed," however, that evidence would be required in order to remove the impressions.  In response to a question by the Court, Winters said he did not have an opinion regarding the particular crime with which the defendant was charged, and could disregard any impressions or ideas he then entertained and render a verdict according to the law and evidence.  He would not say, in the circumstances, that in serving as a juror all matters of rumor and criticism directed against the defendant could be *forgotten,* but in arriving at a verdict they could and *would* be disregarded.

The record discloses several pages of examination and cross-examination.  If, under the astute interrogation of the prospective juror, as skillfully directed by attorneys for the defendant, there were seeming admissions of prejudice, yet when taken in hand by the Court, or by the Prosecuting Attorney, satisfactory explanations were made.  There is nothing to indicate that, for a purpose, Winters was endeavoring to become a juror; nor do we think his answers disclose animosity, prejudice against the individual, or a subversive intent.  The fact that as citizens Winters and Watson believed that the law should be enforced, that gambling-house operations were not conducive to social morality, and that reasonable laws should be respected,—these form no legally tenable basis for the presumption that a person entertaining such views would disregard evidence and a Court's instructions in order to penalize a particular defendant; and certainly considerations like these would be absent where

---

[1] See *Buchanan* v. *United States,* 164 Fed. 2d 15.  Joe Buchanan and Ira Coleman Roberts were convicted of conspiring to commit an offense against the United States by transporting in interstate commerce stolen money of the value of $5,000, "knowing the same to have been stolen, and to have committed certain overt acts to effect the object of this conspiracy."

the. defendant was a partial paralytic, one for whom sympathy is ordinarily entertained.

The Court did not err in refusing to excuse either of the two. *Jackson* v. *State,* 103 Ark. 21, 145 S. W. 559; *Dolan* v. *State,* 40 Ark. 454; *Sneed* v. *State,* 143 Ark. 178, 219 S. W. 1019; *Sullins* v. *State,* 79 Ark. 127, 95 S. W. 159, 9 Ann. Cas. 275; *St. Louis, I. M. & S. R. Co.* v. *Stamps,* 84 Ark. 241, 104 S. W. 1114; *Corley* v. *State,* 162 Ark. 178, 257 S. W. 750; *Hale* v. *State,* 146 Ark. 579, 226 S. W. 527.

(c)—*Competency of Evidence.*—The indictment charged the defendant with operating a gambling house known as Joe Buck's place, March 1, 1948. Certain witnesses were allowed to testify "to occurrences admittedly subsequent to March 1."

J. T. Fite, a contractor, was employed by appellant and C. A. Pope "about a month ago" to start doing certain construction work on the building designated in the indictment, and without objection was allowed to testify regarding dice and card tables, and gambling activities, including five slot machines. Objection was interposed when the Prosecuting Attorney asked what Buchanan and Pope had agreed to pay Fite for the addition of a room. The Court ruled that the question "appeared to be competent," and Fite replied that he received $1,600, and that payment was in cash.

No objections were made to Webb's testimony when given.

Garrison testified without objections, but on cross-examination it developed that, as a carpenter employed by Fite, he and others built the addition formerly referred to subsequent to March 20; whereupon counsel for the defendant moved "to strike the entire testimony of this witness." When the motion was overruled a similar request was made (with like effect) respecting Webb's testimony. Later, when Lane testified to facts already established by the other witnesses, the defendant moved ineffectively to have all of the testimony expunged.

The indictment was returned April 14, 1948. All of the matters testified to by the witnesses mentioned in

the several motions occurred before that time. Section 3841 of Pope's Digest makes immaterial the statement in an indictment that an offense was committed at a particular time, "further than as a statement that it was committed before the time of finding the indictment, except when the time is a material ingredient of the offense." In *Scoggins* v. *State,* 32 Ark. 205, it was said that "  . . . the time should be laid on a day prior to the finding of the indictment, and within the period of limitations."

It can hardly be argued in the case at bar that time was a material ingredient of the offense. Appellant was quite definitely informed that he was being tried for operating a gambling house. It was not a transaction involving a single day, or even a limited period. The record clearly discloses that the defendant did not consider the technicality of importance until it was shown that he paid $1,600 in cash. The motion then was that *all* testimony of these four witnesses be excluded. The suggestion was in the nature of an all-inclusive effort to strike competent evidence as well as testimony thought to be incompetent; and for this reason alone the Court correctly ruled adversely.

(d)—*Exclusion of Testimony.*—With refreshing candor and becoming frankness, Mr. J. M. Willemin, in arguing the case orally here, conceded that the trial Court did not abuse its discretion in excluding testimony of other crimes charged to the defendant.

(e)—*Sufficiency of the Evidence.*—Stress is laid upon the proposition that, conceding the Court's discretion to direct trial on the felony charge first, the indictment alleged that Buchanan kept and exhibited gaming devices, which is a misdemeanor. Prejudice is predicated upon the Court's instruction that if a reasonable doubt be entertained respecting the more serious charge, "you will take up and consider the charge of keeping and exhibiting gaming devices." It is insisted that the Court, in effect, told the jury the order in which their deliberations should proceed and but for this language the

defendant might have been found guilty of a misdemeanor.

We do not think the Court was in error. There was, of course, a presumption that the jury would determine whether the defendant was guilty of a felony, but there was no objection to the instruction, and certainly it is not inherently wrong.

Affirmed.

Ed. F. McFaddin, Justice, dissenting. The trial by jury is one of the bulwarks of our judicial system. In 31 Am. Juris. 552 there is this enlightening and concise statement concerning the right of trial by jury:

"The right to jury trial is immemorial. It was brought from England to this country by the colonists, and it has become a part of the birthright of every free man. It is a right which is justly dear to the American people, and one which is expressly guaranteed by the Federal Constitution and by the Constitutions of the several states. In Magna Charta, the basic principle of the right to jury trial is more than once insisted on as the great bulwark of English liberties, especially by the provision that 'no freeman shall be hurt, in either his person or property, unless by lawful judgment of his peers or equals, or by the law of the land'—a privilege which, according to Blackstone, is 'couched in almost the same words with that of the Emperor Conrad, two hundred years before.' The 'judgment of his peers', alluded to in Magna Charta, is one, in the language of former times, on a 'trial per pais' or 'trial by the country', which is a trial by a jury who are the peers of the party accused, being of the like condition and equality in the state. . . . It has been observed that the just purpose and excellence of trial by jury, especially in criminal cases, are not imaginary and whimsical or the outgrowth of popular ignorance and persistent clamor. While it is not perfect as a method of trial and is sometimes perverted and prostituted, nevertheless the practical experience of centuries has proved its value in criminal cases especially.''

It is unnecessary to extol the jury system. It has its faults, as any human system has, but it has remained through the centuries as our palladium against the tyrannical enforcements of laws. Only when impartial and unprejudiced men, fairly selected, sit in the jury box, does a defendant receive the trial which our judicial system seeks to guarantee. In the case at bar one of the jurors admitted that he entered upon his duties with a partially biased and prejudiced mind.

I hold to the view that the trial court abused its discretion in requiring the defendant to accept Hansel Winters as a juror in the trial of the case. The defendant had previously exhausted all of his peremptory challenges and was therefore powerless to protect himself from having Winters on the trial jury. The examination of Winters on his *voir dire* occupies 12 pages in the transcript. Winters admitted that for some time he had been reading the newspaper accounts about this defendant and had heard discussions on the street and had even heard some of the witnesses testify in the Federal trial. This appears:

"Q. And you have heard discussions and read in the newspapers about the trial of this defendant in the Federal Court here; is that true? A. Yes sir. Q. There was a good deal of newspaper publicity at that time? A. Yes sir. Q. And you heard it? A. Yes sir. I heard part of the trial. Q. You were not on that jury panel? A. No sir. Q. But you heard a lot of discussion about it at that time didn't you? A. Yes sir. Q. And you heard people express great satisfaction at the action of the trial court didn't you? A. Yes sir. Q. And great criticism when the trial court was reversed? A. Yes, I have heard that."

    .     .     .     .     .

"Q. So, now, with all of that information—with all of that in your mind over a period of a year and a half or more, you have an impression which at least amounts to an opinion, as to this man's guilt or innocence, don't you? A. You are bound to have some impression."

"Q. And the background and the impression which you have, you would have to hear evidence to remove that, wouldn't you? A. I presume so."

And the following are the final questions and answers and the trial court's final ruling accepting Winters as a juror:

"Q. It (*i. e.,* "impression") would still go in that jury box with you and you would have to have evidence otherwise to erase it, wouldn't you? A. Probably so. Q. And after evidence had been offered to equalize it, from that time on you would have to consider the rest of the evidence to see whether there was still a reasonable doubt in your mind, wouldn't you? A. Well, yes. Mr. Adams: I again submit him. Mr. Hale: This juror is not disqualified. The Court: In view of the statements that the prospective juror has made with regard to his not having any opinion as to this particular charge, I am going to rule that he is not disqualified."

In short, the last question the juror answered before the Court ruled him competent, was to the effect that it would take evidence to erase from his mind the impression of guilt of the defendant; and it must be remembered that the juror had heard a portion of the trial in the Federal Court. I understand the law to be that a juror is not disqualified if his opinion is based on *rumor;* and if he states that he can and will disregard his opinion previously formed, and base his verdict upon the testimony offered in the present case. This rule is recognized in Corley v. State, 162 Ark. 178, 257 S. W. 750, and in other cases cited in the majority opinion.

But the situation presented in the case at bar, regarding the juror, Hensel Winters, does not come within the purview of the above-mentioned rule because:

(1) Winters had been in the Federal Court when the case against appellant was being tried, so his opinion was based on something more than rumor; and

(2) Winters said during and including the last of his *voir dire* that it would require positive evidence to overcome his opinion previously formed.

In *McGough* v. *State*, 113 Ark. 301, 167 S. W. 857, there is this clear statement of the correct test for a juror: ''The juror is supposed to stand disinterested between the parties to the litigation, and to be able to make up his verdict solely on the law and evidence; and if he cannot do this, he is not a competent juror, and it is immaterial what the cause may be which prevents him from doing so.''

Measured by this test, Winters was not a qualified juror, and the circuit court erred in refusing to excuse him. Our State Constitution (Art. II, § 7, and Amendment XVI) guarantees that ''trial by jury shall remain inviolate.'' The defendant's jury trial did not ''remain inviolate, because one of the jurors was biased by reason of previous opinion.''

For the reasons herein stated, I respectfully dissent; and I am authorized to state that Mr. Justice HOLT and Mr. Justice MILLWEE concur in this dissent.