## WALKER v. STATE.

4560                                        221 S. W. 2d 402

Opinion delivered June 13, 1949.

Rehearing denied July 4, 1949.

*Reinberger & Elibott, Max Smith,* and *O. E. Gates,* for appellant.

*Ike Murry,* Attorney General, and *Arnold Adams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Stanley Jewel Johnson, 21 years of age, died July 5, 1948, from the effect of knife cuts and stabs found by the jury to have been inflicted by Robert Walker. The defendant has appealed from a judgment that he serve 21 years in the penitentiary for second degree murder. The motion for a new trial lists 31 alleged errors, and six are argued.

Primarily, appellant rests his defense upon want of identification. He denies using a knife, although admitting participation in what is spoken of as a "gang fight."

Essential facts were these: Stanley Jewel and his brother Albert, with Dorsey Williams, had started to Mahoney's Ferry on Saline river where they planned to fish. Seven miles north of Rison the highway forms a Y, one branch leading to Pine Bluff, the other to Sheridan. Selman's dance hall, beer joint, and combination grocery faces Highway 79 at the Y. The Johnson brothers and Williams had procured provisions at Pine Bluff, but when they reached the Y one of the three remembered they had neglected to buy bread. For this reason they stopped at Selman's store. There was evidence from which the jury could have found that none had recently touched intoxicants of any kind.

Appellant Walker, 27 years of age, was employed in Pine Bluff, but resided six miles north of Rison. Accom-

panied by Roy Wilson, he drove to Pine Bluff and received a wage payment. The two then drank beer and liquor, and were joined by Carroll West, who is Walker's brother-in-law. They spent some time at West's home, partaking liberally of beer and whiskey, then started the drive that took them to the Y, where Wilson lived. Estelle West, appellant's sister, had joined them.

When the four arrived at the Y, John Dugan and his wife, and Charles Reynolds, were in the beer joint and dance hall. Although some of the testimony is conflicting, and there is an absence of certainty, Dugan, Albert Johnson, Williams, and Appellant Walker were identified as having been in the building. By this time it was getting dark—"good dusk," as one witness said. Wilson procured bottled beer and returned to the car, and was talking with West. Jewell Johnson was in front of West's car when appellant came up. Jewell had just asked how far it was to the river, and whether fishing was good. While Wilson was shaking hands with Jewell, appellant walked close enough to overhear Jewell say his name was Johnson; whereupon, according to Wilson's version of the transaction, appellant turned to Jewell and said, "What did you say your name was?" When Jewell replied, "Johnson", appellant said, "We don't give a damn about the Johnsons", and at the same time struck Jewell with his fist, knocking him down. When Jewell got up appellant knocked him down again, and got on top of him. Williams then went to Jewell's relief, and assisted by Dugan, pulled the assailant off of the prostrate man. Jewell called to his brother and said, "Albert, come here: Walker has cut me". Wilson saw a knife in appellant's hand, and saw him chasing Williams.

Williams had testified that he had been in the building a minute or two when he heard a commotion on the outside. A fight appeared to be in progress. Walker had Jewell down, with his left hand on Jewell's throat. With the aid of "another fellow" (whom he later identified as Dugan) Jewell was relieved. When Walker got to his feet he struck at Williams, but missed; then Williams struck Walker and "staggered" him. When

Walker "came up" he had a knife in his hand. When this testimony was being given, the trial judge said to the witness, "Tell the jury just what you heard and saw". After indicating where he stood and where Jewell and Walker were, Williams replied: "Walker walked up [to Jewell] and struck him with an overhead lick like this—indicating. When he struck Jewell it went just like sticking a knife in a watermelon. If you have ever stuck a knife in an overripe watermelon [you will understand], that is what it went like. I saw the knife in Walker's hand as he came down [with it] and struck Jewell".

Wilson, after describing the fight, testified that he went home with Walker and saw him cleaning blood from a knife. Walker put the knife on the ground and "rolled it" with his foot.

Charles Reynolds, 17 years of age, was cut on an arm and in the back and elsewhere, but did not know who did it. Dugan and Albert Johnson were slightly cut.

Jewell was taken to a hospital, where a physician treated him. Medical testimony was that a knife wound about ten inches in length extended from the upper part of the chest downward. There was also a stab through the chest wall through which a portion of one lung protruded, "and every time he would breathe, both air and blood would escape". Another slash 12 or 13 inches long began under a shoulder and extended to the abdominal wall.

There was other testimony supporting the jury's finding that the assault was made by Walker, hence the plea in respect of identification must be determined against appellant.

The second point argued is that Bertram Wilson was improperly accepted as a juror. The record shows that Wilson had heard discussions regarding the encounter, and on the basis of statements made in these circumstances he had formed an opinion. He could, however, disregard any preconceived beliefs, and would be guided entirely by the evidence. This was sufficient. *Buchanan v. State*, 214 Ark. 835, 218 S. W. 2d 700. Neither was it

shown that the appellant had exhausted his peremptory challenges. *Washington v. State,* 213 Ark. 218, 210 S. W. 2d 307.

When nine jurors had been selected and an additional venire was ordered, the Court directed State Policeman J. V. Rudy to take charge of those selected, after the requisite instructions as to deportment had been given. Rudy was sworn as a special deputy, and served for approximately fifteen minutes. The defense then challenged regularity of the proceedings, took proof of what had been done, and asked for a mistrial. The point was urged that Rudy was a resident of Jefferson County, hence incompetent to serve as an officer in Cleveland County. Section 243 of the Criminal Code, Ark. Stats. (1947) § 43-2121, vests in the trial court a discretion, before a cause is submitted, to allow jurors to separate, "or be kept together in charge of a proper officer." Since the Court had a right to allow the nine jurors to separate, it can hardly be said that discretion was abused when an officer was placed in charge of them and the right to separate was denied. See *Hendrix v. State,* 200 Ark. 973, 141 S. W. 2d 852; *Hyde v. State,* 212 Ark. 612, 206 S. W. 2d 739. In *Albright v. Karston,* 206 Ark. 307, 176 S. W. 2d 421, it was held that in respect of certain duties a State Policeman possesses the power of a Sheriff and may act anywhere in the State. In the case at bar it was not shown that any prejudice attended.

The fourth point argued is that prejudice resulted when the Court permitted Sheriff Morgan to testify regarding the location of lights when he reached Selman's place less than an hour after the cutting occurred. Appellant thinks a proper foundation should have been laid by showing actual conditions when Walker acted. A second objection is that some of the witnesses had testified that the area near the building was too dark to admit of identification. There had, however, been testimony that light came through windows. A complete answer to appellant's objection is that the Sheriff did not undertake to say what the conditions were when the cutting occurred. He only testified to things observed approximately forty-

five minutes after Jewell had been cut. See *Pinson v. State*, 210 Ark. 56, 194 S. W. 2d 190, where it was held that no prejudice resulted to the defendant because witnesses were allowed to testify from rough drawings and photographs, there being no contention that the drawings were accurate, or that they were actual reproductions of the homicide or the area where the shooting was alleged to have occurred. So, here, no one was led to believe that the Sheriff intended to testify that physical conditions he observed were those actually existing when Walker and Jewell clashed.

Allen Templeton, State Policeman with the rank of Lieutenant, had testified that he was in charge of the laboratory at Little Rock, and that "they" brought to him a knife with blood on it, and that "Trooper Rudy" told him it was supposed to belong to Carroll West. West had also been charged with killing Johnson. Templeton said "they" told him it was West's knife, but the blood sample was not sufficient for technicians to determine that it came from a human being. No knife purporting to have been taken from Walker was brought to Templeton. The Court instructed the jury to disregard this testimony, saying: "[This testimony] has nothing to do with the innocence or guilt of the defendant, Walker. In arriving at your verdict you will only consider the evidence that goes to the one question: whether, under the evidence and instructions of the Court, the defendant is guilty." Defendant's counsel remarked, "Note our exceptions. I want you to declare a mistrial." The motion was overruled.

The knife, as an exhibit, was properly excluded for want of identification. What Rudy or someone else may have told Templeton regarding the West knife, or whether in fact it was West's, was not pertinent to Walker's defense. Even if the knife had belonged to West, and the defendant's purpose was to create an inference the particular weapon was used on Jewell, it must be remembered that others were cut the same night.

It is insisted that defendant's requested Instruction No. 3 should have been given. It would have told the

jury that if it entertained a reasonable doubt the defendant was guilty of murder in the first degree, it could convict him of second degree murder, and if doubtful regarding second degree murder, there could be a conviction "for that degree of homicide as to which you entertain no reasonable doubt." An examination of given instructions shows that the subject was fully covered.

Complaint is made of the Court's refusal to give the defendant's requested Instruction No. 5. It would have told the jury that if it "believed from the evidence that more than one person stabbed or cut or wounded the deceased, . . . and you have a reasonable doubt . . . as to whether the defendant cut or stabbed or wounded the deceased, . . . then you are instructed that you cannot convict the defendant of any degree of homicide." Again, the answer is that proper instructions were given, of which complaint is not made. The Court was not required to duplicate its instructions.

Affirmed.